1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10
11
12
13
14
15

| | |
|---|---|
| PETER JACOB JOHNSON,<br><br>                                    Petitioner,<br><br>v.<br><br>J.A. YATES, Warden,<br><br>                                    Respondent. | Civil No.    09cv2073-JLS (BGS)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE TO DENY PETITION FOR WRIT OF HABEAS CORPUS** |

16
17
18

        This Report and Recommendation is submitted to United States District Judge Janis L. Sammartino pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2.

19

## I.  INTRODUCTION

20
21
22
23

        Peter Jacob Johnson (herein "Johnson") is a state prisoner proceeding *pro se* on a Petition for a Writ of Habeas Corpus (herein "Petition") pursuant to 28 U.S.C. § 2254.  (Doc. No. 1 at 1.)  For the reasons discussed below, the Court recommends that the Petition be **DENIED** and that this action be **DISMISSED WITH PREJUDICE**.

24

## II.  PROCEDURAL BACKGROUND

25
26
27
28

        On November 30, 2006, a jury in the San Diego Superior Court found Johnson guilty of murder in the first degree (Cal. Penal Code § 187), with an enhancement for use of a firearm in commission of the murder (Cal. Penal Code § 12022.5).  (Lodgment 1 at 197.)  On January 19, 2007, the trial court sentenced Johnson to life in prison with the possibility of parole, plus a

consecutive two year term for the firearm enhancement.  Johnson was also ordered to pay direct restitution to the victim's family in the amount of $1,900 and a restitution fine in the amount of $10,000.  (*Id.* at 198.)

Johnson filed an appeal with the California Court of Appeal, Fourth Appellate District, Division One.  (Lodgment 3.)   Johnson's appeal claimed that the prosecutor committed misconduct by cross-examining him in a manner that caused him to disclose his prior convictions and that the trial court erred in admitting additional evidence of these prior convictions.  (*Id*. at 17-46.)  Johnson also appealed the imposition of the direct restitution and restitution fine.  (*Id*.)  On December 20, 2007, the California Court of Appeal found error as to the restitution orders and reversed that aspect of  the trial court's order, but otherwise found no reversible error and affirmed Johnson's conviction.  (Lodgment 6.)  Johnson did not seek further review in the California Supreme Court.

On June 18, 2008, Johnson filed a Petition for Writ of Habeas Corpus in the San Diego Superior Court.  (Lodgment 7.)    The court denied the petition in an unpublished opinion. (Lodgment 8.)  On January 13, 2009 Petitioner filed for Writ of Habeas Corpus in the California Court of Appeal, Fourth Appellate District, Division One.  (Lodgment 9.)  Likewise, the appellate court denied the petition in an unpublished opinion.  (Lodgment 10.)  Finally, on March 27, 2009, Johnson filed a Petition for Writ of Habeas Corpus in the California Supreme Court.  (Lodgment 11.)  The California Supreme Court denied the petition on August 19, 2009, citing *In re Swain*, 34 Cal.2d 300, 304 (1949).  (Lodgment 12.)

### III.  FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct. 28 U.S.C. § 2254(e)(1); *see also Parke v. Baley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness).  Johnson may rebut the presumption of correctness, but only by clear and convincing evidence.  *Id.*  Because Johnson has not rebutted the factual findings with clear and convincing evidence, the following facts are taken from the California Court of

1    Appeal's opinion in *People v. Johnson*, No. D050190, slip op. (Cal. Ct. App. December 20,

2    2007).  (Lodgment 6 at 2-4.)

3            In May 2006, Detective Robert Donaldson, a detective with the San Diego
     police department's homicide cold case team, received a series of telephone calls
4    from Johnson, who was living in Oklahoma. In three calls (some of which were
     recorded), Johnson told Detective Donaldson that he had committed a homicide
5    in San Diego many years earlier, and provided various details concerning the
     crime.  Detective Donaldson searched old police records and found a record of the
6    homicide, which had occurred on September 17, 1978.  The victim was 19-year-
     old Robert Spencer.

7
             During a taped telephone interview on May 19, 2006, Johnson described
8    the homicide and the circumstances leading up to it.  Johnson stated that he
     sometimes stayed with a friend (Frank Edwards) who lived in the same apartment
9    complex where victim Spencer lived.  During this time period (the 1970's),
     Johnson was heavily involved in drug use, and he connected Spencer with a
10   marijuana supplier.  Thereafter, Johnson was told that on one occasion when
     Spencer was left alone with the marijuana supplier's young daughters, Spencer
11   molested one of the girls.  Johnson decided to talk to Spencer about this.  An
     opportunity to do so presented itself when Spencer and Johnson were in Spencer's
12   car.

13           Johnson, who had just used some heroin, was in the back seat and Spencer
     was in the front driver's seat.  Johnson told Spencer that he needed to ask
14   him"'about those two little girls and what you did there.'"  Spencer had "guilt
     written on [his] face" and started stammering.  Based on Spencer's reaction,
15   Johnson stated, "Well, I guess you know what this is all about don't ya?"  Johnson
     then shot Spencer with a .38-caliber special gun in the back of his head under the
16   right ear.  After the shooting, Johnson dragged the body out of the car and put it
     in the trunk, drove the car to an alley off Murray Ridge Road, and abandoned the
17   vehicle there.

18
             Johnson told Detective Donaldson that he killed Spencer because he hated
19   child molesters; he felt responsible because he had introduced Spencer to the
     marijuana supplier; he "just freaked"; and at the time he thought killing Spencer
20   was the best solution.  He stated he and Edwards were questioned by detectives
     at the time of the killing, but Edwards had nothing to do with it.  When Detective
21   Donaldson inquired why Johnson decided to call the police, Johnson explained
     that he had been living with what he did his entire life; he felt like "hell" inside for
22   having killed someone; he had twice "had . . . a gun to [his] head"; he had met
     good people in Oklahoma, including a woman he was going to marry; and he had
23   confessed his crime to his pastor and been advised to contact the police or he
     would go "nuts."

24
             On May 24, 2006, Detectives Donaldson and Lynn Rydalch conducted a
25   videotaped interview with Johnson in Oklahoma.  During his lengthy interview
     Johnson again detailed the circumstances leading to the shooting and
26   acknowledged that he committed the crime.  Johnson's description of the manner
     in which he killed Spencer and disposed of his body was consistent with the
27   information acquired by the authorities at the time of the homicide.

28           By the time of trial, Johnson recanted his confession.  Testifying on his
     own behalf, he stated that when he called Detective Donaldson in May 2006, he

had lost his job, he was living in his car, he had no money, and he was drinking alcohol and contemplating suicide.  He had known Spencer in San Diego, and he knew details about his death from news reports and from statements made by the detective who interviewed him at the time of the homicide.  He claimed that in desperation, he formulated a plan that he would falsely confess to the murder, make a deal to go to prison for about three years, collect Social Security and save money, and have a new start in life when he was released.

## IV.  PETITIONER'S CLAIMS

Johnson presents four grounds for federal habeas relief.  First, Johnson claims that his trial counsel rendered ineffective assistance by: (a) disrupting the *Marsden* hearing; (b) being unprepared for trial; (c) failing to challenge certain witness testimony; (d) failing to make certain arguments; and (e) failing to object to the prosecutor leading witnesses.  Second, Johnson claims that the prosecutor committed misconduct by: (a) knowingly soliciting perjured testimony.  Third, he contends that the prosecutor solicited false evidence and misstated the facts throughout trial.  Last, Johnson contends that the trial court violated his constitutional rights by excluding exculpatory evidence.  (Doc. No. 1 at 9-24).

Respondent argues that habeas relief is unavailable because Johnson's claims presented to the state court were denied for being speculative and lacking evidentiary support.  (Doc. No. 13-1.)  Thus, Respondent contends that Johnson has not effectively exhausted his claims and is barred from seeking federal relief at this time.  (*Id.* at 3-5.)  Respondent further argues that Johnson's claims do not present colorable arguments entitling him to federal habeas relief on the merits.  (*Id.* at 5-15.)

## V.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which effected amendments to the federal habeas statutes, applies to the present Petition because Johnson filed it after AEDPA's effective date—April 26, 1996.  *Lindh v. Murphy*, 521 U.S. 320, 336, (1997).  "By its terms [AEDPA] bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)."  *Harrington v. Richter*, ——U.S. ——, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011).

A federal court may review a habeas petition by a person in custody under a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).   Federal habeas relief is not available for state law errors. *Swarthout v. Cook*, ––– U.S. –––, 131 S.Ct. 859, 861, 178 L.Ed.2d 732 (2011) (per curiam) (citing *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)).

Under AEDPA, a federal court may not grant habeas relief on a claim adjudicated on its merits in state court unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Clearly established federal law" means federal law that is clearly defined by the holdings of the Supreme Court at the time of the state court decision. *See*, e.g., *Cullen v. Pinholster*, ––– U.S. –––, 131 S.Ct. 1388, 1399, 179 L.Ed.2d 557 (2011) (citation omitted). Although only Supreme Court law is binding, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir.2011) (citation omitted).

In determining whether a decision is "contrary to" clearly established federal law, a reviewing court must evaluate whether the decision " 'applies a rule that contradicts [such] law' " and how the decision "confronts [the] set of facts that were before the state court.' " *Cullen*, 131 S.Ct. at 1399 (quoting *Williams v. Taylor*, 529 U.S. 362, 405, 406 (2000). If the state decision " 'identifies the correct governing legal principle' in existence at the time," a reviewing court must assess whether the decision " 'unreasonably applies that principle to the facts of the prisoner's case.' " *Id.* (quoting *Williams*, 529 U.S. at 413).  An "unreasonable application" of law is " 'different from an incorrect application' " of that law. *Richter*, ––– U.S. –––, 131 S.Ct. at 785 (quoting *Williams*, 529 U.S. at 410). Similarly, a state-court decision based upon a factual determination may not be overturned on habeas review unless the factual determination is

-5-

1    " 'objectively unreasonable in light of the evidence presented in the state-court proceeding.' "

2    *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

3        The AEDPA standard requires a high level of deference to state court decisions, such that

4    a state decision that a claim lacks merit precludes federal habeas relief so long as " 'fairminded

5    jurists could disagree' on the correctness of the state court's decision." *Richter*, 131 S.Ct. at 786

6    (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Accordingly, to obtain federal

7    habeas relief a state prisoner must show that the state court's decision on a federal claim was "so

8    lacking in justification that there was an error well understood and comprehended in existing law

9    beyond any possibility for fairminded disagreement." *Id*. at 786–87.  Moreover, even if this

10   Court finds such a state-court error of clear constitutional magnitude, habeas relief is not

11   available unless the error "had substantial and injurious effect or influence in determining the

12   jury's verdict." *Fry v. Pliler*, 551 U.S. 112, 116 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S.

13   619, 637 (1993)).

14       Where more than one state court has adjudicated the petitioner's claims, the federal

15   habeas court analyzes the last reasoned decision. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th

16   Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991), for presumption that later

17   unexplained orders, upholding judgment or rejecting same claim, rest upon same ground as the

18   prior order). Thus, a federal habeas court looks through ambiguous or unexplained state court

19   decisions to the last reasoned decision in order to determine whether that decision was contrary

20   to or an unreasonable application of clearly established federal law.  *Medley v. Runnels,* 506

21   F.3d 857, 862 (9th Cir. 2007); *Bailey v. Rae*, 339 F.3d 1107, 1112–13 (9th Cir. 2003).

22       Yet, when "no state court has explained its reasoning on a particular claim, [the federal

23   habeas court must] conduct an independent review of the record to determine whether the state

24   court's decision was objectively unreasonable."  *Hein v. Sullivan*, 601 F.3d 897 905 (9th Cir.

25   2010).

26   ///

27   ///

28   ///

# VI.  ANALYSIS

## A.  Exhaustion

Despite the state court's citation to *In re Swain*, Johnson has exhausted his claims because after independently reviewing the Petition, the Court finds that Johnson has "fairly presented his federal claims to the Supreme Court of California." *Kim v. Villalobos*, 799 F.2d 1317, 1320 (9th Cir. 1986).  Further, this Court is not precluded from reviewing Johnson's Petition on procedural grounds because the state court denied his petition "both on the merits and by applying the state's procedural bar rule."  *Loveland v. Hatcher*, 231 F.3d 640, 643 (9th Cir. 2000).

## B.  Ineffective Assistance of Counsel Claims

Johnson claims he was denied effective assistance of counsel.  To succeed on an ineffective assistance of counsel claim, "[p]etitioner must establish both: (1) that counsel's performance was so deficient that it fell below an 'objective standard of reasonableness' and (2) that the deficient performance rendered the results of his trial unreliable or fundamentally unfair."  *Cox v. Ayers*, 613 F.3d 883, 892-93 (9th Cir. 2010) (quoting *Strickland v. Washington*, 466 U.S. 668 (1984)).  While "[j]udicial scrutiny of counsel's performance must [always] be highly deferential," *Wong v. Belmontes,* —U.S.—, 130 S.Ct. 383, 384-85, 175 L.Ed.2d 328 (per curiam)*,* where AEDPA applies, the Court exercises "doubly deferential judicial review." *Knowles v. Mizayance,* —U.S.—, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009).

The state court determined that Johnson failed to independently corroborate his assertions of ineffective assistance of counsel with objective evidence.  (Lodgment 8.)  The state court further determined that Johnson did not establish that he suffered any prejudice as a result of counsel's purported errors.  (Lodgment 8, 10.)  Thus, a "doubly" deferential judicial review is appropriate in evaluating Johnson's ineffective assistance of counsel claim.  *Richter,* 131 S.Ct. at 788.  The question becomes not whether counsel's actions were reasonable, but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  Id.

///

///

///

-7-

i. <u>Marsden Hearing</u>

Johnson claims that trial counsel was deficient because he disrupted the first *Marsden* hearing. (Doc. No. 1 at 21.) Even assuming that defense counsel's disruption a criminal defendant's *Marsden* hearing is proper grounds for an ineffective assistance of counsel claim, it is clear from the Reporter's Appeal Transcript that counsel made no such disruption. On August 8, 2006, Johnson and trial counsel appeared before the court for a *Marsden* hearing. (Lodgment 13.) The trial judge allowed Johnson to state why he believed the motion should be granted. (*Id.*) Johnson argued that there was a conflict of interest between him and the Public Defender's Office. Johnson argued that counsel wanted him to take a plea deal and Johnson would prefer an attorney that will work to "actually protect [his] rights." (*Id.* at. 2.) The judge then asked trial counsel if he had anything to say. (*Id.*) Trial counsel responded and stated that he did not believe he should be relieved for explaining the realities of sentencing guidelines and likely offers from the District Attorney's Office. (*Id.* at 3.) Counsel also indicated that there was no reason to believe that the Public Defender's Office did anything wrong. (*Id.*) The trial court denied Johnson's motion and prohibited Johnson from further speaking. (*Id.*)

There is nothing in the record to indicate that the exchange between the trial judge and counsel took place in such a manner that the attorney sabotaged Johson's *Marsden* hearing. The trial court denied Johnson's motion to substitute counsel because it did not find any grounds to justify substitution. (Lodgment 13.) While it appears Johnson disagreed with counsel's advice, nothing suggests there was an irreconcilable conflict resulting in a total lack of communication or that counsel's representation fell below an objective standard of reasonableness. *Richter*, 131 S.Ct .at 787; *Stenson v. Lambert*, 504 F.3d 873, 876 (9th Cir. 2007) ("Disagreements over strategical or tactical decisions do not rise to the level of a complete breakdown of communication."). Accordingly, the Court finds that counsel's behavior during the *Marsden* hearing was not deficient.

ii. <u>Failure to Prepare</u>

Johnson further contends that counsel did not properly prepare for trial. Johnson states that he only met with his attorney to discuss his case once for 15 minutes. (Doc. No. 1 at 19.)

1   Johnson evidences the lack of preparation by referring to counsel's failure March 20, 2012 to

2   challenge certain witness testimony.  (*Id.* at 19-21.)  Specifically, Johnson argues that counsel

3   should have challenged: (1) Detective Thwing's inconsistent testimony, (2) Kitty Dean's

4   inconsistent statements and story regarding Johnson's attempt to sell her a gun, and (3) Detective

5   Donaldson's testimony regarding taking notes and tape recording his conversation with Johnson.

6   (*Id.* at 19.)

7                    Detective Thwing

8          Detective Richard L. Thwing was a detective on the scene of the murder.  When called

9   to the stand, Detective Thwing testified regarding the scene of the crime, his contact with

10  Johnson, and what he believed to be Johnson's residential address in 1978.  (Lodgment 2, Vol.

11  4 at 157-165.)  Defense counsel also cross-examined Detective Thwing.  (*Id.* at 166-168.)  After

12  reviewing the trial record, it remains unclear the specific testimony that Johnson believes

13  Detective Thwing changed and why counsel should have challenged the testimony.  In order to

14  establish a Sixth Amendment violation, however, Johnson  must point to specific errors on the

15  part of his counsel.  *See Young v. Runnels*, 435 F.3d 1038, 1043 (9th Cir. 2006).  Because there

16  is nothing in the record suggesting that counsel lacked a strategic purpose for failing to challenge

17  Detective Thwing's testimony, Johnson has not established ineffective assistance.

18                    Kitty Dean

19         During Johnson's trial, Kitty Dean, best friend of the mother of the victim, testified that

20  Johnson did not like the victim because he felt that the victim drank more than his fair share of

21  the group's alcohol.  (Lodgment 2, Vol. 4 at 149.)  Johnson claims, however, that in 1978 Dean

22  told police officers that Johnson did not like the victim, but did not know why he harbored ill

23  feelings.  (Doc. No. 1 at 19.)  On cross-examination Johnson's counsel did not inquire into why

24  Dean's story changed from what was contained in the 1978 police report to what was stated

25  during the 2006 trial.  (*Id.* at 150-154.)

26         Counsel has considerable discretion regarding trial strategy.  *Reynoso*

27  *v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006) (counsel is "afforded leeway in making tactical

28  decisions regarding trial strategy").  Dean's testimony stating that Johnson did not like the victim

1   for reasons related to alcohol is insignificant.  When Johnson confessed, he claimed that he

2   committed the murder because the victim was a child molester and Johnson felt guilty for

3   introducing the victim to the parents of the children that were molested.  (Lodgment 1 at 67-68.)

4   Thus, counsel's decision not to further inquire into Dean's potentially inconsistent statements

5   regarding Johnson's reason for disliking the victim falls within the wide range of reasonable

6   professional assistance and tactical choice.  Challenging Dean's allegedly inconsistent statements

7   would have had no effect on negating the proffered motive for the crime.  *See Jones v. Ryan*, 583

8   F.3d 626, 636 (9th Cir. 2009).

9                                   Detective Donaldson

10      Detective Donaldson, the detective with the San Diego Police Cold Case Team, had many

11   conversations with Johnson regarding the crime.  (Lodgment 1 at 6-123.)  The first two times

12   that Johnson called, Detective Donaldson testified that he did not record the calls but took notes

13   on a yellow legal pad.  (Lodgment 2, Vol.4 at 184, 187.)   On the other occasions Detective

14   Donaldson recorded the calls.  In one of the taped calls, the tape recording does not start at the

15   beginning of their conversation.  (*Id*. at 38.)  While testifying at trial, Detective Donaldson

16   explained that the recording did not immediately begin because he was unprepared for Johnson's

17   call and was unable to get his tape recorder running in time to record the start of the

18   conversation.  (Lodgment 2, Vol. 4 at 204.)

19      According to Johnson, Detective Donaldson lied about only taking notes during the first

20   two calls and presented conflicting testimony about the unrecorded part of the one phone

21   conversation.  (Doc. No. 1 at 19.)  It appears that Johnson wanted his counsel to challenge

22   Detective Donaldson's testimony about these issues.  (*Id*.)  Johnson, however, does not specify

23   how trial counsel should have challenged Detective Donaldson's testimony.  There is nothing

24   in the record to suggest that Detective Donaldson lied about taking notes during the first two

25   calls he received from Johnson and the record reflects that the notes were provided to the

26   prosecution and defense.  (Lodgment 2 Vol. 4 at 187.)   After reviewing the trial record, it

27   remains unclear the specific testimony that Johnson wanted his counsel to challenge and why

28   counsel should have challenged the testimony.  In order to establish a Sixth Amendment

1  violation, however, Johnson  must point to specific errors on the part of his counsel.  *See Young,*

2  435 F.3d at 1043.  Because there is nothing in the record suggesting that counsel lacked a

3  strategic purpose for failing to challenge Detective Donaldson's testimony that he only took

4  notes during the first two phone calls, Johnson has not established that counsel's performance

5  was deficient.

6       With respect to the missing part of one phone recording, the transcript establishes that a

7  portion of the conversation was not recorded because the tape does not open with a greeting.

8  (Lodgment 1 at 38.)   Instead, the recording picks up in the middle of a conversation between

9  Johnson and the detective.  (*Id.*)  Nevertheless, the detective provided a reasonable explanation

10  for why the entire conversation was not recorded.  (Lodgment 2 ,Vol. 4 at 204.)   Arguably,

11  counsel could have had the detective explain in greater detail his reason for not having the

12  recording equipment prepared, but his failure to do so is immaterial.   Counsel is given

13  considerable discretion in making strategic decisions in whether to challenge certain testimony.

14  *See Duncan v. Ornoski*, 528 F.3d 1222, 1235 (9th Cir. 2007); *see also Reynoso v. Giurbino*, 462

15  F.3d 1099, 1112 (9th Cir. 2006).  Johnson has not established that counsel's failure to challenge

16  this testimony was deficient.

17       In sum, counsel cannot be faulted for failing to adequately investigate and prepare

18  Johnson's case.  From the record, it appears that counsel was aware of the evidence and

19  understood what the trial testimony would be.  Counsel's decision not to challenge certain

20  witness testimony does not suggest that counsel was deficient.  "Counsel was entitled to

21  formulate a strategy that was reasonable at the time . . . ."  *Richter*, 131 S.Ct. at 789.  Moreover,

22  Johnson has failed to demonstrate a reasonable probability that, but for counsel's failure to

23  challenge the witnesses testimony, the result of the trial would have been different.  *Strickland*,

24  466 U.S. at 694.

25            iv.  Failure to Present Arguments/Evidence

26       Johnson also argues that counsel was deficient for his failure to illustrate the

27  inconsistencies between the details of the crime that Johnson when he confessed and the physical

28  evidence presented by the medical examiner.  (Doc. No. 1 at 20.)  Johnson contends that counsel

1    was deficient because he failed to argue the factual improbability of the murder taking place

2    in the manner Johnson described in his confession. (*Id.*)

3          On May 19, 2006, Johnson called Detective Donaldson from Oklahoma regarding an

4    unsolved murder. (Lodgment 1 at 6.) In their discussion, Detective Donaldson asked Johnson

5    how the victim had been shot and Johnson responded, "Through . . . Under . . . Kind of under

6    the back of the head, under the ear there, you know?" (*Id.* at 20.) Johnson also stated that he

7    was laying down in the back seat of the victim's car when he fired the gun and that the shot

8    struck the victim on the right side of the head. (*Id.*)

9          At trial, the medical examiner testified that a bullet "struck the back base of [the victim's]

10   skull . . . ." (Lodgment 2, Vol. 4 at 130.) The medical examiner further testified that the damage

11   to the brain occurred to "[t]he base of the brain, the right side, the area called the cerebellum .

12   . . ." (*Id.*) On cross-examination, counsel (C) questioned the medical examiner (ME) regarding

13   the manner in which the victim was shot:

14        C:     What was the diameter of the entrance wound through the skull?

15        ME:    I was not able to measure that from that particular location. On the inside aspect

16               of his skull, it was more or less a long semi-oval appearing opening, about one and

17               a half inches long and about one-half inch in width. But one needs to keep in

18               mind that this is a bullet that is striking not quite glancing blow to the base of his

19               skull.

20        C:     Now, is that consistent with a bullet rising, in other words, being fired from a

21               lower position than the head, or would that be consistent with a position where the

22               bullet is coming down from a position higher than the head?

23        ME:    No real way of saying, because keep in mind that the head can be moved in

24               forward direction or backward direction, and that would change the orientation of

25               the entrance into the head itself. On the other hand, if one says that the person is -

26               - the decedent is in an upright position facing forward, it is more or less on a level

27               plane. It is not an obvious upward plane into the skull itself. It is not an obvious

28               plane going downward. It's more or less level, maybe slightly downward.

1   C:      So, in other words, if I get this straight, what you're saying is that if the head was

2           in a position like nodding downward that it would affect the entrance wound

3           through the skull?

4   ME:     May make it appear to be going in an upward direction if both the decedent and

5           the assailant were at the same level.

6       The medical examiner's testimony clearly states that the victim was shot in the base of

7   the right side of the skull.  The testimony also indicates that due to the head's ability to change

8   position and orientation, it is impossible to tell the exact direction which the bullet was coming

9   from when it entered the skull.  This testimony does not actually conflict with the facts presented

10  in Johnson's confession.  The Supreme Court has stated that "[e]ven if some arguments would

11  unquestionably have supported the defense, it does not follow that counsel was incompetent for

12  failing to include them.  Focusing on a small number of key points may be more persuasive than

13  a shotgun approach." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).  Thus, this Court finds no

14  error in counsel's tactical decision not to split hairs on this particular fact.

15      Additionally, according to Johnson, his confession to the murder had him doing enough

16  heroin to kill himself, then shooting the victim in the head, carrying the dead body weighing

17  approximately 200 pounds and placing it in a trunk, burying the gun in a residential housing

18  area, finding a blanket to wipe the blood off of himself, and finally getting someone to drive him

19  25 miles to a neighboring city.  (Doc. No. 1 at 20.)  Johnson argues that this scenario is

20  "ridiculous" and if presented to the jury in this manner they would not have believed Johnson

21  could possibly have committed the murder.  (*Id.*)

22      Once again Johnson challenges counsel's tactical decision not to pursue a specific

23  argument.  As addressed earlier, counsel receives considerable discretion in making tactical

24  decisions during trial.  *See Duncan*, 528 F.3d at 1235.  Here, counsel knew the facts stated in

25  Johnson's recorded confession and decided not to present an argument to the jury that the factual

26  scenario as confessed was not practicable.  This is insufficient to "show that 'counsel's

27  representation fell below an objective standard of reasonableness.'" *Richter*, 131 S.Ct. at 787

28  (quoting *Strickland*, 466 U.S. at 688).  Furthermore, the jury heard Johnson's entire recorded

confession. (Lodgment 2, Vol. 4 at 194, 198, 201, 203-204, 206.) The jury had before them all of the evidence and were capable of independently deciding whether Johnson's confession was "ridiculous." The jury, however, did not do so.

Finally, Johnson chose to testify in his own defense; therefore, he had the opportunity to, and did attempt to contradict the other witnesses' testimony. For instance, Johnson testified that he had never met Kitty Dean, that he never drank with the victim, and that his entire confession was a lie. (*Id*. at 253-257, 266-275.) Because Johnson testified, the jury was able to directly judge his credibility and the likelihood that he hatched a plan to confess to a murder that he did not commit in order to save money while serving approximately three years in prison.

Taken in context, especially since the jury heard Johnson's recorded confessions and his live testimony, he has not shown that there is a reasonable probability that, but for counsel's failure to highlight the improbability that the crime could have actually taken place in the manner Johnson confessed, the result of the proceeding would have been different.

v. Failure to Object to Prosecutor Leading Witnesses

Lastly, Johnson argues that counsel repeatedly allowed the prosecutor to lead his witnesses. (Doc. No. 1 at 22.) Yet, Johnson does not cite to specific instances where counsel permitted the prosecutor to lead witnesses.

A general statement with no evidence cited in its support does not constitute proper grounds for an ineffective assistance of counsel claim. Johnson must claim specific errors on the part of his counsel in order to establish a Sixth Amendment violation. *See Young v. Runnels*, 435 F.3d 1038, 1043 (9th Cir. 2006). Johnson offers no evidence for his claim, thus the Court does not find that counsel was ineffective for failing to object.

Applying the "doubly deferential" standard applicable to a habeas court's review of an ineffective assistance of counsel claim, this Court finds that Johnson has demonstrated neither deficient performance nor prejudice. Thus, this Court concludes that the state court's adjudication of Johnson's ineffective assistance of counsel claim was not contrary to or an unreasonable application of clearly established federal law. Accordingly, Johnson is not entitled to habeas relief on this claim.

-14-

1   **C. Prosecutorial Misconduct**

2                    i. <u>Submission of Perjured Testimony</u>

3          Johnson also claims that the prosecutor committed misconduct by introducing perjured

4   witness testimony. (Doc. No. 1 at 23.) Johnson contends that the prosecutor and defense

5   counsel were both aware that Kitty Dean presented untrue testimony. (*Id.*) Johnson identifies

6   the following statements as untrue: (1) that Johnson attempted to sell Kitty Dean a gun in 1978,

7   and (2) that Johnson disliked the victim because of alcohol. (*Id.*) Specifically, Johnson argues

8   that this testimony was false because these statements were not included in the 1978 police

9   report. (*Id.*)

10         An independent review of the record establishes that Johnson's claim for prosecutorial

11  misconduct stemming from the presentation of Kitty Dean's testimony is without merit.

12  Although the prosecutor has a duty to refrain from knowingly presenting perjured testimony, the

13  record in this case does not establish that the prosecutor knew or should have known that Dean's

14  testimony was false. Rather, the testimony presented an issue of credibility for the jury to

15  resolve. *See United States v. Geston,* 299 F.3d 1130, 1135 (9th Cir. 2002) (distinguishing

16  prosecutorial misconduct in presenting perjured testimony from the presentation of evidence that

17  included conflicting versions of criminal events); *United States v. Necoechea*, 986 F.2d 1273,

18  1281 (9th Cir. 1993) (holding that prosecutor's presentation of contradictory testimony is not

19  improper unless prosecutor knows statements are perjurious). Moreover, Johnson had an

20  opportunity to impeach Dean on cross-examination and present her credibility as an issue to the

21  jury. These circumstances provide no basis for habeas relief on the ground of prosecutorial

22  misconduct. *Murtishaw v. Woodford,* 255 F3d 926, 959 (9th Cir. 2001) (holding that

23  inconsistencies in prosecution witness's testimony does not warrant habeas petition on grounds

24  of perjury and prosecutorial misconduct).

25                    ii. <u>Misstating Facts</u>

26         Furthermore, Johnson claims that the prosecutor committed misconduct by repeatedly

27  misstating the facts. (Doc. No. 1 at 25.) Specifically, Johnson contends that the prosecutor

28

1   misstated Johnson's address at the time of the crime and repeatedly emphasized Johnson's

2   "lucky guesses" with respect to the details of the murder.

3         It is clearly established that a prosecutor commits misconduct when he or she manipulates

4   or misstates the evidence presented during the trial, offers unsolicited personal views on the

5   evidence, or vouches for the veracity of a government witness. *Darden v. Wainright*, 477 U.S.

6   168, 181–82 (1986).  However, courts are reluctant to find prosecutorial misconduct where the

7   prosecutor's "misstatement has earmarks of inadvertent mistake, not misconduct." *United States*

8   *v. Carrillo*, 16 F.3d 1046, 1050 (9th Cir.1994).  "[I]t is not enough that the prosecutor's remarks

9   were undesirable or even universally condemned. The relevant question is whether the

10  prosecutor's comments so infected the trial with unfairness as to make the resulting conviction

11  a denial of due process."  *Darden*, 477 U.S. at 181 (citation, internal citation and internal

12  quotation marks omitted); *see also Bonin v. Calderon*, 59 F.3d 815, 843 (9th Cir.1995) ("To

13  constitute a due process violation, the prosecutorial misconduct must be so severe as to result

14  in the denial of [the petitioner's] right to a fair trial."), cert. denied, 516 U.S. 1051 (1996).

15        On habeas review, a federal court will not disturb a conviction unless the alleged

16  prosecutorial misconduct also had a "substantial and injurious effect or influence in determining

17  the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993) (citation and internal

18  quotations omitted); *Burks v. Borg*, 27 F.3d 1424, 1431 (9th Cir.1994) (*Brecht* standard applies

19  to claims of prosecutorial misconduct), cert. denied, 513 U.S. 1095, 1160 (1995).

20        Johnson argues that the prosecutor purposely elicited testimony from Detective Thwing

21  that Johnson lived in the apartment complex where the victim also lived.  (Doc. No. 1 at 26.)

22  Johnson apparently contends that this constituted misconduct because the prosecutor questioned

23  the detective about the address in an attempt to discredit Johnson's statements that he was taken

24  downtown for a gun shot residue test.  (Doc. No. 1 at 28.)  Nonetheless, Johnson personally

25  testified at trial that he lived in "East San Diego on 38th and Thorn," and also personally testified

26  that he was taken downtown for a gun shot residue test.  (Lodgment 2, Vol. 5 at 252.)  Johnson

27  was also questioned by his own counsel about whether he told Detective Thwing that he lived

28  on Gerana Street.  (*Id.*)  Johnson explained that he never lived on Gerana Street and never told

-16-

1  the detective that he lived there, but rather that he often visited Frank and Betty Edwards at their
2  apartment complex on Gerana Street.  (*Id.*)  Thus, the jury had the ability to evaluate Johnson's
3  credibility compared to that of the other witnesses.  There was nothing improper about the
4  prosecutor questioning witnesses about Johnson's residence in 1978, and in any event, the
5  prosecutor's remarks did not "so infect the trial with unfairness as to make the resulting
6  conviction a denial of due process."

7       Johnson also alleges that the prosecutor committed misconduct when he cross-examined
8  Johnson and sarcastically indicated that the confession was full of "lucky guesses."  (Doc. No.
9  1 at 25.)  Johnson argues that by referencing these "lucky guesses" the prosecutor misstated the
10  evidence.  (*Id.*)  For instance, during Johnson's direct testimony, he explained that he made an
11  "educated guess . . . . A very educated guess" that the gun used to kill the victim was a .38
12  caliber.  (*Id.* at 267.)  During cross-examination the prosecutor merely followed up with
13  questioning regarding how Johnson guessed that a .38 caliber gun killed the victim.  (*Id.* at 297-
14  98.)  The prosecutor simply emphasized that despite Johnson claiming he was not
15  knowledgeable about guns, he "got lucky" by guessing that a .38 was the weapon used, and
16  similarly "got lucky" guessing the position of the shooter, the location of the gunshot wound,
17  that the car was stopped when the shot was fired, and was also "lucky" to guess all of these
18  correct details 28 years after the crime took place.  (*Id.*)

19       A review of Johnson's testimony on cross-examination indicates that the prosecutor's
20  references to "lucky guesses" did not manipulate or misstate the facts, nor did they deprive him
21  of a fair trial.  Likewise, the state courts did not find that the prosecutor committed misconduct.
22  In fact, the San Diego Superior Court determined that Johnson failed to provide any objective
23  evidence in support of his claims. (Lodgment 8.) Even assuming, *arguendo,* that the prosecutor
24  misstated Johnson's address and that his repeated references to "lucky guesses" were improper,
25  Johnson has not shown that the alleged misconduct had a substantial and injurious effect or
26  influence in determining the jury's verdict, i.e. that he suffered prejudice.

27       After an independent review of the record, the Court determines that any alleged
28  misstatements did not have a "substantial and injurious effect" on the jury's verdict. *Brecht*, 507

1   U.S. at 637.   Accordingly, the state court decision denying relief on this claim was not

2   objectively unreasonable and habeas relief is not warranted on this ground.

3   **D.  Exclusion of Exculpatory Evidence**

4   i.  Third Party Culpability

5       In ground four of the Petition Johnson contends that his right to a fair trial was violated

6   when the trial court excluded evidence of a third party's potential culpability. (Doc. No. 1 at 30-

7   32.) Johnson seems to argue that the following evidence should have been admitted: (1) In 1978

8   Roger Maurice told the police that on September 16, 1978 at about 2:00 a.m. he saw a white

9   male exit a black car and the man said "I killed him."  (Doc. No. 1 at 30; Lodgment 1 at 153.)

10  (2) Donald Young was the original suspect in the case and that in 1981 a teletype was sent to let

11  police know that Young was a possible participant in one or more homicides that took place in

12  California and one of those murders involved a body in the trunk of a car.  (*Id*. at 30-31.) (3) An

13  anonymous call alleged that Donald Young had "bragged about killing a white male in San

14  Diego and placing him in the trunk of his car."  (*Id*. at 31.)

15      Prior to trial, the prosecution moved to exclude evidence of third party culpability.

16  (Lodgment 2, Vol. 4 at 56.)   In deciding to exclude the evidence, the trial court applied

17  California Evidence Code section 352 and determined that without some direct or circumstantial

18  evidence linking the third party to the actual perpetration of the crime, the court would not

19  permit the defense to present evidence of third party culpability.  (*Id*. at 58-59.)

20      Generally, violations of state evidentiary law are not cognizable in a federal habeas

21  corpus petition. *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) (reiterating that "it is not the

22  province of a federal habeas court to reexamine state-court determinations on state-law

23  questions"). To be entitled to federal habeas relief, the petitioner must demonstrate that the

24  evidentiary ruling rendered the trial so fundamentally unfair so as to violate due process. *Leavitt*

25  *v. Arave*, 383 F.3d 809, 829 (9th Cir.2004) (as amended) (per curiam); *see also Spivey v. Rocha*,

26  194 F.3d 971, 977–78 (9th Cir.1999) ("It is well settled that a state court's evidentiary ruling,

27  even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so

28  fundamentally unfair as to violate due process.") (citation omitted).

Under California law, third party culpability evidence is inadmissible "if it simply affords a possible ground of suspicion against [another] person; rather, it must be coupled with substantial evidence tending to directly connect that person with the actual commission of the offense." *Perry v. Rushen*, 713 F.2d 1447, 1449 (9th Cir. 1983) (quoting *People v. Green*, 27 Cal.3d 1, 22 (1980)). Even if third-party culpability evidence "is not actually irrelevant," the court does not violate a defendant's Sixth and Fourteenth Amendment rights when it prohibits evidence that "is sufficiently collateral and lacking in probity on the issue of identity . . . ." *Id.*

Johnson's proposed evidence was excluded pursuant to state law regarding the admissibility of third-party culpability evidence, on the grounds that the evidence was not sufficient to link the third person either directly or circumstantially to the crime. The Court of Appeals for the Ninth Circuit has determined that where the proffered evidence simply affords a possible ground of suspicion pointing to a third party and does not directly connect that person with the actual commission of the offense, that evidence may be excluded. *See People of Territory of Guam v. Ignacio*, 10 F.3d 608, 615 (9th Cir.1993) (citing *Perry v. Rushen*, 713 F.2d 1447, 1449 (9th Cir.1983)).

The state court's decision to exclude the evidence of potential third party culpability was not unreasonable. Accordingly, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence presented. Johnson is not entitled to habeas relief on this claim.

### ii. Evidence Regarding Frank Edwards Getting Rid of a .38 Caliber Gun

Johnson also seems to argue that exculpatory evidence indicating that Frank Edwards' son, David, told a neighbor that Frank got rid of his .38 caliber gun was omitted from trial. (Doc. No. 1 at 30.) This allegation, however, is barely intelligible. After a thorough review of the record, the Court cannot find any indication that this evidence was offered and excluded. Even assuming the defense attempted to offer evidence that Frank Edwards got rid of his gun and the trial court excluded the evidence, Johnson has not met his burden in showing a due process violation based on this evidentiary ruling. *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th

Cir. 2005).  Accordingly, the Court concludes that Johnson is not entitled to relief on his claim that the trial court erroneously excluded exculpatory evidence.

## VII.  CONCLUSION

Based on the above stated reasons, the undersigned recommends that the assigned district judge: (1) approve and adopt this Report and Recommendation and (2) direct that judgment be entered **DENYING** Johnson's petition for writ of habeas corpus.

This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to 28 U.S.C. § 636 (b)(1).

**IT IS ORDERED** that no later than <u>17</u> days after receiving a copy this Report & Recommendation, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties within <u>14</u> days of being served with the objections.

**IT IS SO ORDERED.**

DATED:  March 22, 2012

Hon. Bernard G. Skomal
U.S. Magistrate Judge
United States District Court